Alice **FURUMOTO** et al.,
Plaintiffs,

v.

**Richard W. LYMAN**, Individually and as President of Stanford University, et al., Defendants.

No. C–72–1997–CBR.

United States District Court,
N. D. California.

Aug. 21, 1973.

Kennedy & Rhine, Michael Kennedy, San Francisco, Cal., for plaintiffs.

McCutchen, Doyle, Brown & Enersen, David M. Heilbron, Gary H. Moore, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER AND JUDGMENT

RENFREW, District Judge.

Plaintiffs, former students at Stanford University, brought this action under 42 U.S.C. §§ 1983 and 1985 and the First, Fifth, Eighth, Ninth and Fourteenth Amendments. They invoke the jurisdiction of this Court under 28 U.S.C. §§ 1331 and 1343. Defendants are members of the Board of Trustees, administration and faculty of Stanford University. The claims arose from plaintiffs' participation in a disturbance in a classroom at Stanford, for which they were given indefinite suspensions from the University. Plaintiffs seek an injunction preventing defendants from enforcing the campus regulations which were applied to them and from continuing plaintiffs' suspensions. Each plaintiff also seeks $125,000 in damages plus interest, attorneys' fees, costs, and any other appropriate relief. Defendants have moved for summary judgment.

## I. STATEMENT OF FACTS [1]

On January 18, 1972, shortly after 11:00 A.M., approximately fifteen people, including plaintiffs, entered Room 127, McCullough Building, on the Stanford University campus, where a scheduled quiz in a course on electrical engineering was being given under the supervision of Professor William Shockley.[2] The racial or ethnic composition of the group was mostly non-Caucasian. Although plaintiffs were registered Stanford students it is not clear that all members of the group were Stanford students. The group's sole purpose was to condemn Shockley's view of genetics while demanding that he debate one Cedric Clark publicly. The intrusion was a planned event, with the members of the group acting in concert.

Shockley announced in a loud and clear voice to the group immediately after they had entered that they were interrupting a quiz and should leave the room. They refused to leave. Shockley then asked them to identify themselves,

---

1. Unless noted to the contrary, the facts contained in this opinion are taken from the findings of the hearing officer to which no exception has been taken by plaintiffs.

2. Professor Shockley, a winner of the Nobel Prize in 1956 for his work in transistor physics, is also well known for his theories on eugenics and dysgenics. However, at no time prior to January 18, 1972, did Professor Shockley ever lecture on or discuss these theories of eugenics and dysgenics in that course in electrical engineering.

which they also refused to do. Most of the group settled in the rear of the room while a tall, black man, unidentified, went to the front and began to read a statement. An unidentified black woman began passing out copies of the statement to class members. The statement declared that Professor Shockley had been "found" by "Third World People" to be "racist" in his writings, speeches and actions. It called his theories "Nazi race theory" and claimed that he was seeking to justify "killing the future generation of black and other poor people * * *." It concluded that: *"We will not allow this to happen."* (emphasis in statement) "As a first step," it demanded that Professor Shockley meet one Cedric Clark in a public debate by February 28, 1972.

Shockley took Polaroid snapshots of the intruders, although the latter covered their faces. Mr. Troy Barbee, a member of the University staff, having received word of the intrusion, came to the classroom. Shockley gave the Polaroid exposures to him, but the black man, having finished his statement, walked toward Barbee, grabbed the exposures from him, and passed them to other intruders. They were never recovered. In an attempt to recover them, however, Barbee in effect pushed the black man down to the floor. Other intruders then rose and shouted accusations at Barbee. This event caused high tensions and the possibility of further disturbances, although generally tensions were low throughout the incident.

Before the black man had begun reading his statement, Shockley had turned on a cassette recorder. The black man turned it off, but Shockley turned it back on. After the black man had finished reading the statement, he removed the cassette and threw it along the floor to other intruders. The cassette too was not recovered.

The action of the intruders effectively prevented the students in Shockley's electrical engineering class from taking the scheduled quiz.

During the black man's statement, Shockley corrected his pronunciation of "eugenics" and "dysgenics." Shockley entered into a debate or dialogue, mostly with the black woman. He, in the words of the Stanford hearing officer, "actively, engagingly, seductively, and provocatively contributed to the continuation" of this debate. The intruders made "baiting and accusatory type statements" of Shockley's racism, allegations of genocide, and equated Shockley's views with the racial views of Hitler. After the debate, which lasted less than thirty minutes, Shockley agreed to give serious consideration to a request for a debate made in the conventional manner as long as certain conditions were met. Once this understanding was reached, the intruders left the room.

Plaintiffs, and one other student, were charged in writing with having violated a university policy in disrupting the effective carrying out of a university function or approved activity.[3] In ac-

---

3. Stanford's Policy on Campus Disruption reads as follows:

"Because the rights of free speech and peaceable assembly are fundamental to the democratic process, Stanford firmly supports the rights of all members of the University community to express their views or to protest against actions and opinions with which they disagree.

"All members of the University also share a concurrent obligation to maintain on the campus an atmosphere conducive to scholarly pursuits; to preserve the dignity and seriousness of University ceremonies and public exercises; and to respect the rights of all individuals.

"The following regulations are intended to reconcile these objectives:

"It is a violation of University policy for a member of the faculty, staff, or student body to (1) prevent or disrupt the effective carrying out of a University function or approved activity, such as lectures, meetings, interviews, ceremonies, the conduct of University business in a University office, and public events; (2) obstruct the legitimate movement of any person about the campus or in any University building or facility.

"Members of the faculty, staff, and student body have an obligation to leave a University building or facility when asked to do so in the furtherance of the above regu-

cordance with Stanford's rules, this case was heard by a hearing officer, who was a professor of law. The hearing lasted eight days. The hearing officer concluded that additional warnings by Shockley that the intruders were disrupting the class would have been ignored.

The hearing officer found that plaintiff Alice Furumoto had been one of the intruders and had made provocative and derisive comments to Professor Shockley. She had known that the course in electrical engineering was in progress when she entered, and she shared the group's purpose of condemning Shockley's genetic theories and demanding the public debate. He found similarly that plaintiff Don Lee was one of the intruders, that he had known the course was in progress, and that he had shared the group's purposes. He also found that plaintiff Kwonping Ho was one of the intruders, had known the course was in progress, and shared the group's purposes. It was also established that plaintiff Ho commented at one point during the incident that the group was not there to debate but to ascertain whether Shockley would agree to debate Clark. With other intruders, he discussed this question with Shockley and reached an understanding. He also asked one of the students in the course if he "knew what his professor was advocating." As to the other person

charged, the hearing officer held that the University administration had failed to prove beyond a reasonable doubt that she had been present or had aided and abetted in the events.

After a hearing, the Campus Judicial Panel affirmed the hearing officer's findings and recommended the indefinite suspension of plaintiffs.[4] The President of Stanford, defendant Richard W. Lyman, adopted that recommendation, and plaintiffs were indefinitely suspended from Stanford.[5]

## II. PLAINTIFFS' TWO CAUSES OF ACTION

Plaintiffs' first cause of action is based on 42 U.S.C. § 1983[6] and claims a deprivation of civil rights and privileges under color of state law. Plaintiffs claim that defendants denied them exercise of their First Amendment rights; that defendants applied to them unconstitutionally vague and overly broad campus regulations on disruption; that the sanction given them, indefinite suspension, constitutes cruel and unusual punishment in that it is disproportionate to the offense charged; and finally that defendants supported racism by giving Professor Shockley a forum and "academic respectability" for his genetic theories and by punishing plaintiffs for their anti-racist actions, causing them grave and irreparable injury.

---

lations by a member of the University community acting in an official role and identifying himself as such; members of the faculty, staff and student body also have an obligation to identify themselves when requested to do so by such a member of the University community who has reasonable grounds to believe that the person(s) has violated section (1) or (2) of this policy and who has so informed the person(s)."

4. Indefinite suspension is a two-year minimum suspension from the University with the possibility of future enrollment being contingent upon a finding by the appropriate campus judicial body that reinstatement "serves the interest of the University community." See the opinion of the Campus

Judicial Panel, Case No. 93, Exhibit M, attached to Affidavit of John Schwartz, p. 12.

5. Plaintiffs have not claimed that their procedural due process rights were violated by these campus proceedings.

6. 42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

In their second cause of action, based on 42 U.S.C. § 1985(3),[7] plaintiffs claim that defendants entered into a conspiracy to deprive them of equal protection of the law in that defendants supported racism and punished plaintiffs' efforts to oppose racism, that defendants sanctioned them but not the University band which had disrupted classes, and that defendants prosecuted them but not others who took similar actions on other occasions.

### III. JURISDICTION

Plaintiffs' allegations fulfill the necessary jurisdictional elements of 42 U.S.C. §§ 1983 and 1985 and 28 U.S.C. § 1343. Although several of the allegations appear insubstantial, the proper judicial course is to assume jurisdiction and then determine whether the allegations constitute claims upon which relief can be granted. Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946):

> "Jurisdiction * * * is not defeated * * * by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover * * *. Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy."

See also Meredith v. Allen County War Memorial Hospital Com'n, 397 F.2d 33, 35 (6 Cir. 1968); Stambler v. Dillon, 302 F.Supp. 1250, 1252 (S.D.N.Y. 1969).

### IV. NO CLAIM IS ALLEGED AGAINST DEFENDANT SHOCKLEY OR DEFENDANT TRUSTEES UPON WHICH RELIEF CAN BE GRANTED

It is a generally accepted and worthy principle that pleadings in civil rights actions should be construed liberally. However, where there is no basis for the claim, the action must be dismissed. Whether a cause of action has been stated upon which relief can be granted is determined by "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); Cohen v. Norris, 300 F.2d 24 (9 Cir. 1962). Thus, courts have dismissed causes of action under the Civil Rights Act if the allegations did not relate to a deprivation of civil rights or were lacking in factual substance. See United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2 Cir. 1970). Where, as here, civil conspiracy is the basis of a claim, particular facts must be alleged which show a conspiracy depriving the complaining party of the equal protection of the laws or of equal privileges and immunities under the laws. General accusations do not suffice. Gillibeau v. City of Richmond, 417 F.2d 426, 428-430 (9 Cir. 1969); Hoffman v. Halden, 268 F.2d 280, 295 (9 Cir. 1959).

In this case, plaintiffs' allegations as to the Trustees and as to Professor Shockley do not amount to claims upon which relief can be granted. The complaint alleges that all defendants

7. 42 U.S.C. § 1985(3), in relevant part, provides: "If two or more persons in any State or Territory conspire * * * for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

have supported racism in ° punishing plaintiffs who were protesting racism instead of supporting them in their actions. They also charge defendants with supporting racism by giving Professor Shockley a forum for his genetic theories and academic respectability while denying a forum for anti-racist views. The only other actions which plaintiffs attribute to the Trustees are managing and controlling the University and vesting authority and responsibility for student conduct and discipline in the President of the University. Plaintiffs have expressly denied reliance on the theory of respondeat superior [8] and aver that all defendants have been sued for their own individual actions. This Court, therefore, holds that with respect to the first cause of action under § 1983, liberally construed, the allegations do not state facts or lead to reasonable inferences that the Trustees deprived plaintiffs of civil rights or privileges.[9]

■ The second cause of action charges that the Trustees conspired to deprive plaintiffs of equal protection of the law by punishing them under unconstitutional regulations while not punishing others who engaged in similar conduct. No specific acts on the part of the Trustees are alleged with respect to the conspiracy. Thus, as to the Trustees, the second cause of action is conclusory and insufficient for a claim upon which relief can be granted.

■ The complaint claims that Professor Shockley's writings are racist, "highly offensive" to anyone opposing racism, and "antagonize and anger" those in opposition. These claims upon analysis simply amount to vehement disagreement with another person's exercise of his First Amendment rights, not a statement of a claim under § 1983. The hearing officer's finding that Shockley did contribute to the continuation of the debate in his classroom does not suggest any deprivation of plaintiffs' civil rights. The second cause of action simply includes Shockley in the alleged conspiracy and again is purely conclusory. Thus, plaintiffs have failed to state a claim upon which relief can be granted against Professor Shockley.[10]

8. Reliance on the doctrine would not have been successful. Section 1983 does not establish a basis for liability, vicarious or otherwise, against persons who do not participate in a civil right violation. Hesselgesser v. Reilly, 440 F.2d 901, 902–903 (9 Cir. 1971). The Civil Rights Act does afford a basis for such liability (42 U.S.C. § 1988) where the laws of the particular state in which the action arose create such liability. Here, however, the law of California specifically precludes such liability. See Cal. Government Code § 820.8.

9. At the hearing on the motion, the Court expressed concern whether plaintiffs named the Trustees as defendants in lieu of the University in order to avoid the bar of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), precluding liability under § 1983 for all but natural "persons." See also City of Kenosha, Wisconsin v. Bruno, 412 U.S. 507, 93 S.Ct. 2222, 37 L. Ed.2d 109 (1973). However, that issue is not presented here for several reasons. The action must be dismissed against the Trustees, first, because no specific acts were alleged as to them; second, because the doctrine of respondeat superior is unavailable; and third, because Stanford has been found not to be the legal equivalent of a state agency and therefore official acts of the Trustees could not be under color of state law.

The Court remains concerned about a possible anomaly in these Civil Rights laws. Monroe v. Pape could be evaded by joining the directors of a state agency and not the agency itself if the relevant state law, applicable through § 1988, included vicarious liability for governmental employees. See note 8, *supra*. In contrast, a state agency cannot be vicariously liable under the Civil Rights laws regardless of possible state law of respondeat superior. Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L. Ed.2d 596 (1973). Thus individuals, and not a state government, may have to bear the financial burden of a civil rights judgment in a case in which they were not charged with having committed any specific acts against the plaintiffs. But see Moor v. County of Alameda, *supra*, at 704, n. 17.

10. Though the action against the Trustees and Professor Shockley has been dismissed, the conclusions of law underlying this Court's decision on the motion for summary judgment would also apply to these defendants if sufficient causes of action had been stated against them.

## V. "COLOR OF STATE LAW" UNDER § 1983

To establish their claims under § 1983, plaintiffs must show that they were deprived of civil rights by the remaining defendants,[11] who in their official capacities were acting "under color of state law." To make this showing, plaintiffs must demonstrate that defendants' official acts in effect were state actions. See United States v. Price, 383 U.S. 787, 794, n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). Preliminarily, there are essentially two theories of state action. First, if an institution is governmental in nature or serves a public function, its acts can be viewed as state action. See Food Employees v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) (shopping center); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (park); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (primary election); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1945) (company town); cf. Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). Second, if the state government is directly involved in the activity in question, private activity can become state action. See Burton v. Wilmington Pkg. Auth., 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); cf. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Plaintiffs contend, in effect, that despite the fact that Stanford is not a state-operated university, defendants' acts were state action under both theories.

### A. Governmental in Nature

Plaintiffs' contention is that the State of California has, by conferring certain powers and benefits upon Stanford, in fact transformed it into a state agency, and hence the remaining defendants in carrying out their official responsibilities were acting under color of state law. They cite the founding of Stanford by a special act of the California legislature,[12] the granting to Stanford's Board of Trustees of corporate powers and privileges,[13] the State's permission to Stanford to charge tuition to California residents,[14] the exemption of Stanford's land from the real property tax and Stanford operations from state income taxes,[15] and the authorization of the use of eminent domain on Stanford's behalf.[16] They also point to the requirement of State approval of Stanford's criteria for awarding degrees,[17] and the State's involvement in student discipline.[18] Plaintiffs allege that Stanford receives financial support from the State, a claim which defendants deny and as to which there is no support in the record, apart from those provisions already cited which at most amount to indirect State support. Indeed, there is a prohibition in the State Constitution of direct State subsidies to private educational institutions.[19] Plaintiffs also argue that Stanford performs a public function—higher education—which makes it governmental in nature. If Stanford did not exist, they contend, the State would have an additional educational burden.[20]

---

11. The remaining defendants are Richard W. Lyman, the President of Stanford; John Kaplan, Chairman of the Campus Judicial Panel, which adjudicated the charges against plaintiffs; and Henry Ramsey, Jr., the hearing officer who determined the facts in plaintiffs' cases.

12. Cal.Const., Art. 9, § 10; see also Cal. Education Code, § 29003.

13. Cal. Education Code §§ 30001, 30003.

14. Cal. Education Code § 30021; see also § 29022.

15. Cal.Const., Art. 13, § 1a; Cal. Education Code § 30031.

16. Cal.Code of Civil Procedure § 1238(2).

17. Cal. Education Code § 29007.5.

18. Cal. Education Code § 31291.

19. Cal.Const., Art. 9, § 8.

20. See Cal. Education Code § 23701.

These facts do not demonstrate, however, that Stanford should be viewed as an arm of the State.[21] The cases relied upon heavily by plaintiffs are inapposite. Evans v. Newton, 382 U.S. 296, 300, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966), for instance, in which the Supreme Court stressed the municipal, public nature of the park in question, also distinguished private schools from the "public function" that the park served:

> "The range of governmental activities is broad and varied, and the fact that government has engaged in a particular activity does not necessarily mean that an individual entrepreneur or manager of the same kind of undertaking suffers the same constitutional inhibitions. While a State may not segregate public schools so as to exclude one or more religious groups, those sects may maintain their own parochial educational systems.
>
> \* \* \*
>
> "If a testator wanted to leave a school or center for the use of one race only, and in no way implicated the State in the supervision, control, or management of that facility, we assume arguendo that no constitutional difficulty would be encountered."

In Commonwealth of Pennsylvania v. Brown, 270 F.Supp. 782 (E.D.Pa.1967), aff'd, 392 F.2d 120 (3 Cir. 1968), cert. denied, 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968), the facts were closely analogous to Evans v. Newton, *supra*. The mayor, aldermen, and citizens of Philadelphia had originally been the trustees of Girard College, which

had racial restrictions on the admission of students. Private trustees were later substituted for the city trustees, but the Orphans Court continued to be involved in the school's operations. The College continued to send reports to the state legislature, and it was still supervised by state agencies. There also was evidence that public school principals assisted the College in finding applicants. Given these factors present in *Brown*, the holding and dicta of that case do not have broad applicability. Similarly, Guillory v. Administrators of Tulane University of La., 203 F.Supp. 855 (E. D.La.1962), rests upon the fact that Tulane was originally a public institution and that nothing sufficient was shown as to how it could have become private. Again, the dicta are not applicable to this case.[22] Belk v. Chancellor of Washington University, 336 F.Supp. 45 (E.D. Mo.1970), involved the authority of a university president, given by the state, to provide educational services and his *failure to prevent disruption* of classes. The court in *Belk* distinguished cases of student suspension in which state action was not found. 336 F.Supp. at 46–47. Finally, Brown v. Strickler, 422 F.2d 1000 (6 Cir. 1970), concerned a municipal university, not a private one, financed by public funds.

Other cases cited by plaintiffs in support of their claims of state action are also inapplicable to the case at hand. United States v. Wiseman, 445 F.2d 792 (2 Cir. 1971), cert. denied, 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 287 (1971), concerned a claim that defendant had caused false affidavits of service of

---

21. As of 1957, at least, the State of California did not consider Stanford a state agency or institution. Stanford and the University of Southern California are not precluded from being members of the Pacific Coast Intercollegiate A.C. because of tax exemption granted by the State: "The fact that a private educational corporation receives donations or tax exemptions from the state does not make it a state agency." 30 Opinions of Attorney-General of California 162, 165 (1957).

22. The authoritativeness of the *Guillory* decision relied upon by plaintiffs is questionable in light of its later history. The summary judgment in that case was subsequently set aside, the temporary injunction vacated, and a new trial granted. These actions were upheld upon appeal. 306 F.2d 489 (5 Cir. 1962). After a trial, the district court found that state action was lacking, but that no court could enforce any racial restrictions in private covenants and thus that the Tulane board was free of those restrictions. 212 F.Supp. 674 (E.D.La.1962).

process to be delivered to a court clerk. That activity is a narrow, specific one that is an incident of the judicial process. Though Eaton v. Grubbs, 329 F.2d 710 (4 Cir. 1964), did characterize the exercise of eminent domain as governmental in nature, that case also included many other weighty indicia of state action: state capital construction subsidies for a hospital, the donation by the city and county of a new building and land, with a reverter clause, and governmental regulations of the day-to-day hospital administration and operation.

In contrast to the inapplicability of the authorities which plaintiffs have cited, a long line of cases under facts very similar to this case have found no state action in a university context. Grafton v. Brooklyn Law School, 478 F.2d 1137 (2 Cir. 1973) (state subsidy and regulation, requirements of N. Y. Court of Appeals governing qualification as "approved law school") Blackburn v. Fisk University, 443 F.2d 121 (6 Cir. 1971) (state chartering, tax exemption, power to condemn property adjacent to campus); Browns v. Mitchell, 409 F.2d 593 (10 Cir. 1969) (incorporation by state, tax exemption for special income from noneducational income-producing property); Powe v. Miles, 407 F.2d 73 (2 Cir. 1968) (state charter, regulation of standards, financial aid, operated state college of ceramics on campus under contract with state which paid expenses of said college); Brownley v. Gettysburg College, 338 F.Supp. 725 (M.D.Pa. 1972) (state approval of program of training public school teachers, state scholarships to qualified students); Bright v. Isenbarger, 314 F.Supp. 1382 (N.D.Ind.1970), aff'd per curiam, 445 F.2d 412 (7 Cir. 1971) (state regulation of educational standards, tax exemption); Torres v. Puerto Rico Junior College, 298 F.Supp. 458 (D.P.R.1969) (federal grants, loans, scholarships); and Grossner v. Trustees of Columbia University in City of N. Y., 287 F.Supp. 535 (S.D.N.Y.1968) (state financial aid). Compare Braden v. University of Pittsburgh, 343 F.Supp. 836 (W.D.Pa. 1972), a district court finding of no state action which has been vacated and remanded by the United States Court of Appeals for the Third Circuit. 477 F.2d 1 (3 Cir. 1973). In that case, however, the state had the power to appoint at least one third of the university's trustees.[23]

 A finding of general state action here would require more than an accumulation of the state benefits or regulations cited by plaintiffs. These factors do not establish state control or the inherently governmental nature of the university. Plaintiffs have not demonstrated that Stanford is controlled by the State of California or that Stanford does not have a substantial sphere of private, independent authority and initiative. The State's grant to Stanford of corporate powers and privileges is not evidence of State control. The State has thus merely given Stanford substantially the same corporate powers and privileges given to any corporation formed under its laws.[24] Nor can plaintiffs find support in the power granted Stanford by legislation to charge tuition to California residents. California Education Code § 30021. The absence of such power would be more noteworthy than its presence in that it could be argued then that Stanford would have been forced by the State to sacrifice normal fees for the interests of the State's citizens. The tax exemptions granted to Stanford extend also to many other nonprofit-making institutions.[25] These exemptions and the power of emi-

---

23. A Pennsylvania statute also refers to the University of Pittsburgh as an "instrumentality of the Commonwealth." 477 F.2d at 6–7. While the record was not clear as to the extent of financial aid supplied by the state, there was some indication in recent years it was over one third.

24. See Cal. Corporations Code, §§ 300, 301, 800 et seq.

25. See Cal.Const., Art. 13, § 1 et seq.

nent domain are indeed benefits accorded Stanford by the State, but the legislature is thereby promoting what it views to be the public interest in the existence of *private* educational institutions. Even if the State directly subsidized the University, this financial aid would not necessitate a finding of State control. The question would then be what control did the State obtain over the University. Here the record is barren as to any control. Nor do the State requirements of certain criteria for awarding degrees constitute State control. The State is thus protecting its citizens from the possibility of substandard education offered by *private* educational institutions. The State's concern for student discipline, the subject of the next subsection, has not been shown by plaintiffs to amount to direct involvement in Stanford's disciplinary process. Finally, plaintiffs' argument that Stanford performs a vital public function which, if Stanford did not exist, the State would have to fulfill, could be extended to virtually all private endeavors. Few institutions, if any, would remain in the private realm. Higher education certainly does serve a public function; thus

> " * * * plaintiffs are correct in a trivial why when they say education is 'impressed with a public interest'. Many things are. And it may even be that action in some context or other by such a University as Columbia would be subject to limitations like those confining the State. But nothing supports the thesis that university (or private elementary) 'education' as such is 'state action.' " Grossner v. Trustees of Columbia University in City of N. Y., 287 F.Supp. 535, 549 (S.D.N.Y.1968).

The Court of Appeals for this Circuit has said in another, instructive context that: "The fact that a private corporation, such as Pacific Bell, enjoys an economic monopoly which is protected and regulated by the state does not necessarily bring its every act within the purview of Section 1983." Martin v. Pacif-

ic Northwest Bell Telephone Company, 441 F.2d 1116, 1118 (9 Cir. 1971), cert. denied, 404 U.S. 873, 92 S.Ct. 89, 30 L. Ed.2d 117 (1971).

B. *State Involvement in the Specific Activity in Question*

For what would otherwise be private action to become state action, the state must have "so far insinuated itself into a position of interdependence * * * that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely' private' as to fall without the scope of the Fourteenth Amendment." Burton v. Wilmington Pkg. Auth., 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961). The question of state action can only be answered "in the framework of the peculiar facts or circumstances present." 365 U.S. at 726, 81 S.Ct. at 862.

Plaintiffs contend that the State of California was a joint participant in the student discipline process which led to their suspension. They claim that the State "implicitly" required Stanford to promulgate rules and regulations on student conduct and discipline, that the State deems any student receiving State financial aid to have agreed to abide by those rules and regulations, that the State denies aid to any student found by Stanford to have violated the rules or disrupted the orderly operation of the campus, and that the State has amended its trespass statute so that refusal to leave the University's private property upon the request of University officials is subject to criminal prosecution.

The United States Court of Appeals for the Second Circuit faced a similar issue in Coleman v. Wagner College, 429 F.2d 1120 (2 Cir. 1970). There the state required that a college's rules and regulations be filed with it; failure to file resulted in the loss of the institution's eligibility for state aid. The state did not require its approval of the rules, nor did it proscribe any activities. The court held that, where the state does not

*expressly* undertake campus regulation, evidence is needed indicating that the state has *in fact* done so, *e.g.*, by state refusal to accept the filing of "inadequate" rules or by the reasonable belief on the part of college officials that a certain "stance" toward student discipline is required of them by the state. 429 F.2d at 1125. This approach is a reasonable one, and this Court will follow it.

■ In the present case, the State has amended a criminal statute which could cover campus disruption. California Penal Code § 602(n) provides that a misdemeanor is committed by "[r]efusing or failing to leave land, real property, or structures belonging to or lawfully occupied by another and not open to the general public, upon being requested to leave by a police officer and the owner, his agent or the person in lawful possession thereof." There is no showing here, however, that the University has abdicated responsibility for student discipline in favor of the State's laws, that the State has pressured the University to conform its rules to the State laws, or that the State has applied pressure to University officials to achieve certain types of campus regulations. Under these circumstances, the overlap in subject matter of State law and University regulations does not establish state action in Stanford's enforcement of its regulations. The only evidence before this Court on this issue is the affidavit of Robert J. Glazer who, as Acting President of the University in 1968, promulgated the Policy on Campus Disruption prior to the adoption in 1969 by the State Legislature of § 31291 of the California Education Code which concerns university discipline. He states that those regulations were never discussed with any representative or agent of the State, that they were not "in any way conceived, considered, caused or effected because of the existence or knowledge of any laws or regulations of the State of California or any

of its agencies" and that at the time of their promulgation he was unaware of any State requirement that such regulations be adopted. This statement also refutes plaintiffs' contention of an implicit state requirement of such regulations.

■ The State has also provided that recipients of its financial aid shall be deemed to have agreed to observe the rules and regulations of their university. California Education Code § 31291. But plaintiffs were neither applicants for nor recipients of such aid,[26] and even if they were, the State does not require any particular substantive regulations. The same statute provides further that any recipient of such aid who is suspended by a university for acts of disruption will be ineligible for State aid for a period of not less than the time of suspension. California Education Code § 31291. Again, the Glazer affidavit demonstrates that this statute has had no impact on the University in the way that it handles discipline.

For these reasons, plaintiffs have failed to show state action on the part of defendants, and thus their claim under § 1983 must fail.

## VI. THE MERITS OF PLAINTIFFS' CLAIMS OF DEPRIVATION OF CIVIL RIGHTS UNDER § 1983

Even if state action were present in this case, plaintiffs' claims fail.

### A. *Plaintiffs' First Amendment Rights*

Although it is not entirely clear from plaintiffs' complaint, one element of their claim seems to be that defendants punished them for their expression of opposition to racism, thus denying them their rights under the First Amendment.

■ That the plaintiffs as students retained their First Amendment rights upon entering the University is clear beyond question. Tinker v. Des Moines School Dist., 393 U.S. 503, 506, 89 S.Ct.

---

**26.** See the Affidavit of Kenneth Kaufman, Assistant Director of Financial Aids at Stanford.

733, 21 L.Ed.2d 731 (1969); Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). But those rights do not include an absolute right to determine how, where, and when such protected expression will take place:

"* * * conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." 393 U.S. at 513, 89 S.Ct. at 740.

See also Adderley v. Florida, 385 U.S. 39, 47–48, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); Cox v. Louisiana, 379 U.S. 536, 554–555, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965); Barker v. Hardway, 394 U.S. 905, 89 S.Ct. 1009, 22 L.Ed.2d 217 (1969) (Fortas, J., concurring in a denial of certiorari); Grossner v. Trustees of Columbia University in City of N. Y., 287 F.Supp. 535, 544–545 (S.D.N.Y.1968). *Cf.* Healy v. James, 408 U.S. 169, 180–185, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Hammond v. South Carolina State College, 272 F.Supp. 947, 949–950 (D.S.C.1967).

That the Stanford regulations are consistent with these authorities is clear from a consideration of the history of the problem which led to their adoption and the very nature of a university environment. Although American campus life has become quiescent in the past few months, the history of university upheavals and turmoil is too recent to require any detailed statement. In the words of the Report of the President's Commission on Campus Unrest, p. 1/5 (1970), "* * * the last decade clearly shows a gradual movement toward more disruptive, violent, and even terrorist tactics in campus protest, and a steady and significant growth in the number of radical students and tactical extremists." After studying the history of the campus disturbances, the Commission found that:

"Universities have not adequately prepared themselves to respond to disruption. They have been without suitable plans, rules, or sanctions. Some administrators and faculty members have responded irresolutely. Frequently, announced sanctions have not been applied. Even more frequently, the lack of appropriate organization within the university has rendered its response ineffective. The university's own house must be placed in order." (p. R–2).

It is to this deficiency which Stanford was plainly responding with its Policy on Campus Disruption. That Policy was not an unreasonable response considering the fragility of a university, the inherent inconsistency of authoritarianism with intellectual freedom, and the need for order:

"An institution committed to intellectual freedom, to individuality, and to the toleration of eccentricity, is bound to be loosely organized at best, and its internal processes of governance and law are bound to be somewhat uncertain." (p. 4/10).

Stanford's Policy on Campus Disruption is limited to the most egregious interferences with campus order and the rights of others. It does not approach being prior restraint, as in Hammond v. South Carolina State College, 272 F. Supp. 947, 949–950 (D.S.C.1967). Nor does it interfere with the right of free association. See Healy v. James, 408 U. S. 169, 181–184, 92 S.Ct. 2338, 33 L.Ed. 2d 266 (1972). There is no evidence that Stanford officials used the regulations to intimidate plaintiffs or any other members of the academic community.

In this case plaintiffs and other members of the disrupting group had other means available for challenging Professor Shockley to a debate. Even if, as plaintiffs have indicated elsewhere, there was need to have black people confront Shockley, there was no reason given why they could not have waited until

after class to present, briefly but completely, their challenge. Even here, they did not, of course, have a right to infringe his personal liberty.

■ At the oral argument on this motion, counsel for plaintiffs put forward the position that in academic life a professor must debate his views publicly if challenged. While this Court would agree that this may be desirable as a part of intellectual responsibility to consider opposing views and respond to them, that responsibility cannot extend to mandate public debating. Such a requirement would in itself be a potential inhibitor of academic freedom, since many individuals simply do not have the personality or talents to perform comfortably and adequately in oral debating. Such a requirement, if widely adopted, could drive otherwise qualified and valuable scholars from academic life. Professor Shockley thus had a First Amendment right to choose the medium for his response to his challengers or indeed even whether to respond at all. Plaintiffs cannot justify their actions by claiming that Professor Shockley would otherwise have been able to avoid a public debate.

■ Plaintiffs' counsel also advanced the position that each member of the academic community has the right to respond to activities which he finds morally offensive, determined by his personal standards, in ways that he feels are necessary. While this Court admires the forthrightness of counsel and his belief in the integrity of individual judgment, it views such a principle as ultimately destructive of the university and of free social life in general in that it would likely lead either to anarchy or to the rule of the mob. *Cf.* Furutani v. Ewigleben, 297 F.Supp. 1163, 1165 (N. D.Cal.1969).

For these reasons, this Court holds that the defendants did not deny nor interfere with plaintiffs' First Amendment rights.

## B. *Vagueness and Overbreadth*

The often quoted standard for determining whether the terms of a statute are unconstitutionally vague comes from Connally v. General Const. Co., 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926): " * * * a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." Though this standard is met here, there is good reason why school regulations do not require such a strict standard:

"Certainly these regulations are not to be compared with the criminal statute. They are codes of general conduct which those qualified and experienced in the field have characterized not as punishment but as part of the educational process itself and as preferably to be expressed in general rather than in specific terms." Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8 Cir. 1969) (Blackmun, J.), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970).

See also Sill v. Penn. State University, 462 F.2d 463, 467 (3 Cir. 1972); Jones v. State Bd. of Education of and for State of Tenn., 279 F.Supp. 190, 201–202 (M.D.Tenn.1968), aff'd, 407 F.2d 834 (6 Cir. 1969), cert. granted, 396 U.S. 817, 90 S.Ct. 145, 24 L.Ed.2d 69 (1969), cert. dismissed as improvidently granted, 397 U.S. 31, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970); General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133, 146–147 (W.D.Mo. 1968).[27]

27. See also the Report of the American Bar Association Commission on Campus Government and Student Dissent, p. 21. The President's Commission on Campus Unrest disagreed, however. See its Report, p. 4/20. See also Wright, The Constitution on the Campus, 22 Vanderbilt L.Rev. 1027, 1060–1066 (1969).

■ The relevant portion of the Policy on Campus Disruption provides:

"It is a violation of University policy for a member of the faculty, staff, or student body to (1) prevent or disrupt the effective carrying out of a University function or approved activity, such as lectures, meetings, interviews, ceremonies, the conduct of University business in a University office, and public events * * *."

The policy also provides that members of the academic community must leave a building or facility when requested to do so by a University official acting officially, and they must identify themselves if requested to do so by an official who has reasonable grounds for believing that they have violated the policy and who has so informed them.[28]

The Supreme Court has upheld criminal statutes, which were at least as general as Stanford's regulations, against challenges of vagueness. In Grayned v. City of Rockford, 408 U.S. 104, 107–108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972), the ordinance upheld read: "[N]o person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof * * *." The court pointed out that any vagueness inherent in the term "tends to disturb" was dispelled by the following specific requirements in the ordinance: (1) the prohibition of the activity at fixed times (when school is in session); (2) at a fixed place (adjacent to the school), (3) the prohibited disturbances being "easily measured by their impact on the normal activities of the school," (408 U.S. at 112, 92 S.Ct. at 2301), (4) the requirement of incompatibility of the noise or diversion with such activities, (5) the need for a showing of causality between the disruption and the noise or diversion, (6) a requirement of actual or imminent interference with the school activities, and (7) that the acts must be willfully done. 408 U.S. at 111–114, 92 S.Ct. 2294. See also Cameron v. Johnson, 390 U.S. 611, 615–616, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968).

The Stanford regulation includes all but the last of the specific requirements cited by the Supreme Court in the Rockford ordinance under scrutiny in Grayned: (1) fixed times (when University functions, activities, or business are being conducted), (2) fixed place (on campus), (3) the measurement of the disturbances by their impact on normal University activities (4) the requirement of the incompatibility of the disturbances and the normal activities, (5) a need for a showing of causality between the acts of the accused and the disturbances (the use of "prevent" and "disrupt" would be appropriate only if the acts had a considerable and easily discernible impact), and (6) the requirement of actual or imminent interference (again inferred from the use of "prevent" and "disrupt"). The lack of a requirement of willfulness is rendered inconsequential by a consideration of the clear purpose of the regulation to reach only planned or otherwise willful action. Thus, the policy requires that a University official request, as was done in this case, that the intruding parties leave, thereby making very unlikely that a disruption could proceed without a high degree of willfulness.

Under the Grayned theory, therefore, there is no constitutional problem of vagueness with the regulation in question. The case upon which plaintiffs have relied is distinguishable, though one must study the statute in the detailed Grayned way to understand the distinction fully. In Corporation of Haverford College v. Reeher, 329 F. Supp. 1196 (E.D.Pa.1971), the state statute in question also used the term "disruption." But it gave the responsibility for determining whether a "refusal to obey" a regulation "contributed to

---

**28.** See note 3, *supra.*

a disruption" solely to the universities. The court interpreted the statute as providing no objective standards and as relying completely upon the arbitrary, subjective discretion of the educational institution. 329 F.Supp. at 1207. Another subsection of the statute was also held to be unconstitutionally vague, where the terms describing the prohibited acts were not limited but rather expanded by other language: "any offense committed *in the course of* disturbing, interfering with or preventing * * *" (emphasis added). The court found this phrase ambiguous in that it could mean offenses related to the disturbance by intention or only by time. 329 F.Supp. at 1208–1209. The absence of limiting terms in *Reeher* is a decisive distinction from *Grayned* and this case. Another case in which courts have found regulations invalid is similarly distinguishable. See Soglin v. Kauffman, 295 F.Supp. 978, 991–994 (W.D.Wis.1968) ("disrupt" again used expansively and without limitations: "[Students] may support causes by lawful means which do not disrupt the operations of the University, or organizations accorded the use of university facilities" (295 F.Supp. at 991)),[29] aff'd, 418 F.2d 163, 167 (7 Cir. 1969) ("misconduct"). *Cf.* Center for Participant Education v. Marshall, 337 F.Supp. 126, 132–133 (N. D.Fla.1972).

Although a statute is not vague, it may still be overly broad in that it includes within its scope clearly permissible activities. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." N. A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963). That specificity is present in the challenged regulation. Given all the limiting terms in it, it is difficult to see how greater specificity could be achieved without sacrificing something of its legitimate purpose. In fact, the regulation here comes squarely within the au-

thoritative *Tinker* ruling: Limitations on expression in the school are justifiable if the conduct proscribed would "materially and substantially disrupt the work and discipline of the school." 393 U.S. at 513, 89 S.Ct. at 740. *Cf.* Dougherty v. Walker, 349 F.Supp. 629, 644 (W.D.Mo.1972).

This Court therefore holds that the challenged regulation is not unconstitutionally vague or overly broad.

## C. *Indefinite Suspension as Cruel and Unusual Punishment*

■ Plaintiffs contend that the sanction imposed upon them—indefinite suspension—is so disproportionate to the offense charged that it is cruel and unusual punishment in violation of the Eighth Amendment. In their complaint plaintiffs also claim that the Policy on Campus Disruption was vague in that it failed "to delineate sanctions to be imposed for prohibited conduct." The question of student discipline is not totally dissimilar to criminal sentencing. In both cases, certainly, the decision-maker must consider the effect of the sentence upon the person to be sanctioned. In criminal sentencing the court must also view the needs of society. Similarly, the campus official must also consider the needs of a special type of society, the university community. In a student discipline case, the appropriate campus official is the expert to whom the court must defer absent "a clear case of constitutional infringement." Esteban v. Central Missouri State College, 415 F.2d 1077, 1090 (8 Cir. 1969) (Blackmun, J.), cert. denied, 398 U.S. 965, 90 S.Ct. 2169, 26 L.Ed.2d 548 (1970). Student discipline is a matter requiring considerable flexibility and first-hand appreciation of the facts and individuals involved. The campus official deciding what sanctions to impose thus should not be constrained by narrow alternatives. In this case, the sanction of indefinite suspension for acts which go against the core of a universi-

---

**29.** This point was not appealed (418 F.2d at 165, n. 2).

ty's mission—free and responsible intellectual interaction—is not at all disproportionate to the seriousness of the offense. The regulation is not unconstitutionally vague with respect to sentencing. See Speake v. Grantham, 317 F. Supp. 1253, 1281 (S.D.Miss.1970), aff'd per curiam, 440 F.2d 1351 (5 Cir. 1971). As the President's Commission on Campus Unrest concluded: " * * * the university must have a procedure for removing, temporarily or permanently, those whose presence poses a danger to its members or processes." Report of the President's Commission on Campus Unrest, p. 4/22–4/23.

### D. *Support of Racism*

Plaintiffs claim that defendants supported racism by affording Professor Shockley a forum and academic respectability while punishing plaintiffs for their actions in opposition to racism.[30] In a decision following New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court has held that:

" * * * absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811 (1968).[31]

That reasoning appears equally applicable here as to Professor Shockley's right to express his particular views with which plaintiffs disagree. Again, it must be remembered that the record is uncontroverted that at no time prior to January 18, 1972, did Professor Shockley ever lecture on or even discuss his theories of eugenics and dysgenics in the course in electrical engineering which plaintiffs disrupted. In this case, then, unless plaintiffs could meet the *Pickering* criteria with respect to Shockley's views, they could not begin to make a case that defendants supported racism by giving him a position. With respect to theoretical work, in contrast to factual description, a showing of falsity would be extremely difficult if not conceptually impossible.[32]

Since Professor Shockley's views have not been shown by plaintiffs to fall outside the First Amendment and the scope of academic freedom, defendants cannot be charged with racism for giving him an academic position.

30. Stanford has, however, twice rejected, once very recently, the offer by Professor Shockley to teach a course dealing with his genetic theories. See the article to this effect appearing in the San Francisco Chronicle on July 12, 1973.

31. But cf. Beauharnais v. Illinois, 343 U.S. 250, 72 S.Ct. 725, 96 L.Ed. 919 (1952), a decision of doubtful authority after the *New York Times* v. *Sullivan* line of cases. On academic freedom, see Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Sweezy v. New Hampshire, 354 U. S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); Note, Developments in the Law—Academic Freedom, 81 Harvard L.Rev. 1045, 1065–1077 (1968).

32. "Progress in the natural sciences is not remotely confined to findings made in the laboratory. Insights into the mysteries of nature are born of hypothesis and specula-

tion. The more so is this true in the pursuit of understanding in the groping endeavors of what are called the social sciences, the concern of which is man and society. The problems that are the respective preoccupations of anthropology, economics, law, psychology, sociology and related areas of scholarship are merely departmentalized dealing, by way of manageable division of analysis, with interpenetrating aspects of holistic perplexities. For society's good— if understanding be an essential need of society—inquiries into these problems, speculations about them, stimulation in others of reflection upon them, must be left as unfettered as possible. Political power must abstain from intrusion into this activity of freedom, pursued in the interest of wise government and the people's well-being, except for reasons that are exigent and obviously compelling." Sweezy v. New Hampshire, 354 U.S. 234, 261–262, 77 S.Ct. 1203, 1217, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring in result).

## VII. PLAINTIFFS' CLAIM OF A CONSPIRACY TO DEPRIVE THEM OF EQUAL PROTECTION OF THE LAW

### A. *The Applicability of § 1985(3)*

 In contrast to their claims under § 1983, plaintiffs do not base their § 1985(3) cause of action upon the contention that defendants' actions constituted state action. In Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), the Supreme Court in effect read into § 1985 a state-action requirement. The Court created an exception to this requirement, however, in Griffin v. Breckenridge, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). The key language describing the parameters of the exception is as follows:

"The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminating animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." 403 U.S. at 102, 91 S.Ct. at 1798.

*Griffin* involved allegations of a racially motivated conspiracy made by plaintiffs who were members of a racial minority and who claimed that they were the targets of the conspiracy. The Court expressly left undecided the question of whether an intent other than racial bias would bring an action within § 1985(3). 403 U.S. at 102, n.9, 91 S.Ct. 1790. There is no evidence here that defendants had a particular racial intent in taking action against plaintiffs. Plaintiffs assert again that defendants supported racism "by presenting the views of defendant Shockley on campus" and by denying plaintiffs equal protection of the law. They also assert a violation of equal protection guarantees by defendants' alleged selective prosecution of plaintiffs (persons of Asian ethnic origin).

The Supreme Court in *Griffin* v. *Breckenridge* stressed that the exception to state action in § 1985(3) was a precisely limited one and did not constitute a "general federal tort law." 403 U.S. at 101–102, 91 S.Ct. 1790. In extending *Griffin,* thus, precision must be retained. The only relevant classes in which plaintiffs would appear to fall are "non-white opponents of racism" and "disrupters of university operations for social or political reasons." Neither of these is sufficiently limited to pass the *Griffin* test, and plaintiffs have failed to show or allege other facts demonstrating the necessary class-based, discriminatory intent. *Cf.* Action v. Gannon, 450 F.2d 1227, 1232 (8 Cir. 1971).

Therefore, plaintiffs' claims do not come within the scope of § 1985(3). Even if § 1985(3) were applicable, however, plaintiffs would fail on the merits.

### B. *The Merits of the § 1985(3) Claims*

 Plaintiffs allege that the "conspiracy was engaged in to foster, promote, encourage, advocate, and support racism by presenting the views of defendant Shockley on campus and to deny plaintiffs equal protection of the law." The Court has already held that defendants did not support racism by giving Professor Shockley an academic position, and plaintiffs have not in the least demonstrated that defendants closed all other means of expressing their opposition to racism and to Professor Shockley. Nor have they shown that they were "prosecuted" for their anti-racism rather than for violations of valid campus regulations on campus disruption.

 Plaintiffs' next charge is selective prosecution in that they were prosecuted but not others who performed similar acts. This charge does not have substance. Plaintiffs contend that they were prosecuted, but not the University band which also disrupted classes during the football season. The band's activities were undoubtedly a legitimate activity upon campus which must be accom-

modated with other legitimate activities. Plaintiffs' actions, in contrast, were clearly proscribed.

 Plaintiffs also contend that other students disrupted classes but were not prosecuted. There were, however, two recent previous prosecutions for classroom disruption at Stanford. The Stanford official in charge of bringing actions against students also offered a reasonable explanation why other charges were not brought, stressing in particular the problem of identifying the students involved.[33] Plaintiffs have not demonstrated that this explanation is unacceptable. Moreover, they fail to satisfy the elements which the Supreme Court has required to establish a violation of equal protection in a *criminal* context:

> " * * * the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). See also Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

Campus officials must have a wide discretion in determining what action should be taken for violations of campus discipline. As long as the reasons behind their selectivity are not invidious or arbitrary, a court should not intervene.

For these reasons, plaintiffs' claims under § 1985(3) are without merit.

There being no genuine issue as to any material fact, the remaining defendants are entitled to summary judgment as a matter of law.

## CONCLUSION

This case and this opinion have necessarily involved a review of society's legal response to the campus unrest of the past decade. Plaintiffs' substantive claims have been found to be opposed by an overwhelming legal consensus. That consensus is not necessarily the idealistic view expressed by Mill [34] of the power of freedom of speech to lead to the "truth;" but the principle is established that a university cannot survive if it becomes a political arena in which direct action is justifiable in terms of personal moral codes. The President's Commission on Campus Unrest has expressed this idea:

> "Academic institutions must be free —free from outside interference, and free from internal intimidation. Far too many people who should know better—both within university communities and outside them—have forgotten this first principle of academic freedom. The pursuit of knowledge cannot continue without the free exchange of ideas." Report of the President's Commission on Campus Unrest, p. R–11.

Plaintiffs' action against the Stanford Trustees and Professor Shockley is dismissed for failure to state a claim upon which relief can be granted. As to the remaining defendants their motion for summary judgment is granted.

The foregoing opinion constitutes the Findings of Fact and Conclusions of Law in this case.

---

33. Other reasons given were that some professors would adjourn their classes when the disturbance began, thus creating difficult problems of proof. Some professors would welcome those disrupting, with some students later complaining. Professors would in some cases take a vote of their students on whether the intruders would be welcomed or not, with the intruders leaving if the vote went against them. Other cases were found simply not to be sufficiently strong cases of disruption warranting disciplinary action.

34. John Stuart Mill, On Liberty, Chapter 2.